Henry W. Dodge, Jr. v. Commissioner.
Dodge v. Commissioner
Docket No. 1568-66.
United States Tax Court
T.C. Memo 1968-238; 1968 Tax Ct. Memo LEXIS 60; 27 T.C.M. (CCH) 1170; T.C.M. (RIA) 68238; October 15, 1968, Filed *60 Petitioner purportedly transferred his entire interest in property in 1960 to a charitable organization. At that time, he intended only to transfer one-fifth of his interest. Held, under Minnesota law, petitioner's unilateral mistake gave rise to an unqualified immediate right to revest in himself title to four-fifths of the interest purportedly transferred. Held further, petitioner's power to revest made the 1960 transfer incomplete as to said four-fifths. Held further, petitioner made a transfer of one-fifth of his interest in 1961 but not in 1962 or 1963. Sheldon S. Baker and Charles M. Blair, for the petitioner. Martin R. Simon, for the respondent. TANNENWALD
[Memorandum Findings of Fact and Opinion] TANNENWALD, Judge: Respondent determined deficiencies in petitioner's income taxes as follows: Taxable year
Deficiency
1961
$ 7,249.65
1962
11,390.83
1963
12,719.40
Concessions on both sides leave only one issue for decision: Is petitioner entitled to a deduction under section 170 [1] in each of the taxable years for charitable contribution of one-fifth of his interest in certain property? Findings of Fact Some of the facts are stipulated and are found accordingly. Petitioner was a legal resident of Los Angeles, California, when he filed the petition herein. He has resided in Los Angeles since late 1959. He filed Federal income tax returns for the taxable years 1961, 1962, and 1963 with the district director of internal revenue, Los Angels, California. Petitioner is a neurosurgeon. At the beginning *62 of 1958, he was practicing at the Mayo Clinic in Rochester, Minnesota. He and his family lived on a 92-acre farm, known as the Gaelic Grove property, which 1171 petitioner and his wife had acquired about seven years before. Feeling that the Minnesota climate was unsuitable for his children, petitioner decided to leave the Mayo Clinic and establish his practice in California. At this point, petitioner first began to consider giving the house at Gaelic Grove, together with a few acres of the land, to the Sisters of St. Francis Academy of our Lady of Lourdes (hereinafter referred to as the Sisters of St. Francis). Petitioner talked over the possibility of making such a gift with his father, who had been his business advisor for a number of years. His father's accountant suggested that the gift be made in fractions over a period of years, so as to derive the maximum tax benefit from it. Petitioner also discussed the proposed gift with his wife, Nina Neal Dodge, with several of his friends, and with Francis O'Brien (hereinafter referred to as O'Brien), a Minnesota attorney who handled many of the legal affairs of the Sisters of St. Francis. He did not at this point in time make any *63 direct contact with the Sisters of St. Francis. In September 1958, petitioner and his family left Minnesota for Italy. For reasons irrelevant to this case, they spent about nine months there. The Gaelic Grove house was left uninhabited while they were away. They came back in June 1959, spent about three months in San Francisco, and then went to Los Angeles, where petitioner set up his practice. The accounting firm of Phillips, Sheffield, Hopson, Lewis & Luther, located in Houston, Texas, had prepared petitioner's income tax returns and given him tax advice for many years. Kenneth Studdard (hereinafter referred to as Studdard), a certified public accountant associated with the firm, began to handle petitioner's tax affairs in the spring of 1958. Sometime during the first few days of 1960, petitioner telephoned Studdard and told him about the proposed gift. Studdard confirmed the desirability of making the gift over a period of years. He suggested that petitioner engage a Minnesota attorney to prepare the deed and that he also get the property appraised. On January 7, 1960, Studdard followed up this telephone conversation with a letter recapitulating the conversation and specifically *64 suggesting that the gift be made over a period of years. Petitioner and his wife then formed the intent to transfer their interest in equal installments over a period of five years. On January 8, 1960, before he had received Studdard's letter, petitioner wrote to O'Brien and asked him to approach the Sisters of St. Francis to see if they would accept the gift. He did not indicate, in this letter, his intent to make the gift fractionally over a period of five years but before July 1, 1960 he communicated this intent to O'Brien. Petitioner and his wife considered that O'Brien was acting as their attorney and believed that Studdard and O'Brien were corresponding with each other. As a physician, petitioner felt incompetent in such matters and depended upon Studdard and O'Brien to work out the legal details of the gift arrangements. Contrary to petitioner's belief, Studdard and O'Brien had no contact with each other during the period before the deed of gift was executed, other than through petitioner. In 1960, O'Brien prepared a general warranty deed conveying the entire interest of petitioner and his wife in the house and six acres of land to the Sisters of St. Francis and sent this *65 deed to petitioner and his wife in California. Since the property was described in metes and bounds, petitioner did not realize its legal effect. On July 1, 1960, petitioner and his wife, believing that the deed conveyed only a one-fifth undivided interest, executed this deed and sent it back to O'Brien. In the course of preparing the 1960 joint income tax return of petitioner and his wife, Studdard asked for and obtained a copy of the 1960 deed of gift. Studdard, who was a lawyer as well as an accountant, noted that it seemed to convey the entire interest rather than an undivided partial interest. On May 3, 1961, he wrote O'Brien to ask what percentage of the property was conveyed in 1960. O'Brien replied that he had understood merely that petitioner and his wife had wanted to convey only the portion of the farm where the house was and knew nothing of their desire to convey only a partial interest in that portion. When Studdard told petitioner of the true legal effect of the deed and his opinion of its tax consequences, petitioner asked Studdard to help him get the mistake corrected. Studdard suggested that petitioner contact O'Brien. Petitioner discovered that O'Brien was unwilling *66 to prepare the documents necessary for a reformation of the 1960 deed. Houston counsel was therefore engaged to prepare the necessary documents. On June 27, 1961, Studdard sent the reformation papers (which included a letter agreement between petitioner and his wife and the 1172 Sisters of St. Francis acknowledging the mistake, a warranty deed covering a onefifth interest in the property, and a cotenancy agreement) to petitioner. Petitioner sent unexecuted copies of the documents to O'Brien. Petitioner and his wife executed these documents soon after their receipt. After receiving the copies, O'Brien telephoned Studdard and told him that he would send petitioner a deed to convey in 1961 a second one-fifth undivided interest. By this time, Studdard believed that the reformation agreement would be successfully completed. On July 11, 1961, he forwarded a joint income tax return to petitioner and his wife, which listed 20 percent of $165,000, or $33,000, as a charitable contribution to the Sisters of St. Francis. Petitioner filed this return and it was received by the district director on July 17, 1961. [2]
*67 O'Brien did not send the deed to convey another one-fifth interest in 1961 to petitioner until August 25, 1961. Petitioner and his wife executed the deed, had it notarized on October 31, 1961, and sent it to O'Brien within a few days thereafter. By this time, petitioner had also sent the executed reformation papers to O'Brien, and both petitioner and Studdard believed that the reformation of the 1960 deed of gift had been completed. Along with the deed to convey another one-fifth interest in 1961, O'Brien sent petitioner a statement of the 1960 property taxes due. This was the last property tax payment petitioner made on the property. O'Brien had told petitioner that he could arrange for the property to be taken off the tax rolls. Petitioner heard nothing more thereafter about property taxes and assumed that O'Brien had succeeded. O'Brien encountered some difficulty in getting the property off the tax rolls. Over Studdard's objection, O'Brien had the original 1960 deed, conveying the entire interest of petitioner and his wife, recorded on December 26, 1961, thereby making it tax exempt. Petitioner and his wife were divorced sometime in 1962. At the time Studdard prepared their *68 income tax returns for 1961, they were either divorced or about to be divorced. He prepared separate returns for them and allocated half of the 1961 gift to each of them, so that the reported amount of petitioner's 1961 gift was $16,500 (onehalf of 20 percent of $165,000). Studdard believed that, if he did it this way, any question as to allocation of the contribution (or of the other items similarly treated) between petitioner and his former wife could be resolved by filing an amended joint return. Nina Neal Dodge later became Mrs. Craig Cullinan and hereafter will be referred to as Nina Cullinan. Petitioner's 1961 income tax return was the last one prepared by Studdard; thereafter, he prepared only the returns of Nina Cullinan. Petitioner's 1962 and 1963 returns, in each of which a contribution to the Sisters of St. Francis of $16,500 was listed, were prepared by John Bretzer, petitioner's business manager. In about August of 1963, petitioner engaged the law firm of Halsted & Crocker in Los Angeles, California, to represent him in his disputes with respondent. One of the matters in dispute was the treatment of the contributions to the Sisters of St. Francis. A month or two later, *69 he law firm discovered that the 1961 reformation papers had never been executed by the Sisters of St. Francis. Petitioner then asked the law firm to take the necessary steps to obtain their execution. The law firm prepared new reformation papers, but when they attempted to obtain Nina Cullinan's signature, they discovered that she was claiming that petitioner never had any interest in the property. Consequently, the firm prepared another set of reformation papers, omitting Nina Cullinan, and pursued the matter with the Sisters of St. Francis through O'Brien's law firm. O'Brien's partner asked that the reformation papers, which recited an error of the scrivener as the reason for the reformation, be changed to indicate "that the church had no real understanding of Dr. Dodge's intention." This was agreed to. At this point, Nina Cullinan, at her request, joined in the reformation procedure. The Sisters of St. Francis, fearful of the consequences of co-tenants who disputed each other's interest, asked that deeds for the balance of the property be given simultaneously with the execution of the reformation papers. Counsel for petitioner and counsel for Nina Cullinan threatened to take the *70 reformation to court if this point were insisted upon. The church gave in, and so petitioner did not convey the 1173 balance of his interest at the time the final reformation papers were executed. Due to these delays, the final reformation papers were not completely executed until August 29, 1964. The reformation agreement provided that the Sisters of St. Francis would accept a deed for a one-fifth undivided interest in lieu of the 1960 deed for the entire interest. The agreement was then recorded. Minnesota counsel advised that the Minnesota courts would be reluctant to order a reformation where the parties had reached agreement privately. Consequently, no judicial sanction was sought for the reformation. Nina Cullinan's contention that petitioner had never had an interest in the Gaelic Grove property stemmed from her desire to establish complete ownership of the remaining 86 acres of the farm associated with the Gaelic Grove property. The matter was brought to litigation and eventually a settlement was reached whereby it was agreed that petitioner's interest was 32 1/2 percent. The parties have stipulated that petitioner's interest in the six-acre parcel was also 32 1/2 percent. *71 For convenience, this six-acre parcel will hereinafter be referred to as "the property." In 1965, petitioner executed and delivered a quitclaim deed covering whatever remaining interest he had in the property. The parties have stipulated that, during all times relevant herein, (1) the fair market value of the six-acre parcel of land, together with the house, was $165,000 and (2) the Sisters of St. Francis was a qualified charitable organization under section 170. Petitioner's motive for wanting to give the land and house to the Sisters of St. Francis was disinterested generosity. Ultimate Findings of Fact Petitioner intended to give only a onefifth portion of his interest in the property in 1960 and his purported deed of his entire interest in that year was due to a mistake of fact. Petitioner did not transfer his entire interest in the property to the Sisters of St. Francis in 1960. Petitioner did transfer a one-fifth portion of his interest in the property in each of the taxable years 1960 and 1961. Petitioner did not transfer any of his interest in the property in the taxable years 1962 and 1963. Opinion The basic issue in this case is when and to what extent *72 did petitioner make charitable gifts of certain property. Petitioner contends that he made a gift of a one-fifth portion of his interest in each of the taxable years 1961, 1962, and 1963. Respondent contends that petitioner made a gift of his entire interest in the property in 1960. Alternatively, he argues that, irrespective of any legal principles which may be applied herein, the evidence fails to show that petitioner effected any transfers whatsoever in the taxable years before us. At the outset, we note that there is no insuperable barrier under the tax laws to seriatim charitable gifts of fractional interests in property over a period of years. Nelson Story III, 38 T.C. 936 (1962), acq. 1965-2 C.B. 6; Rev. Rul. 58-261, 1958-1 C.B. 143. Thus, our inquiry is directed to a determination of petitioner's interest in the property after 1960. Both parties have approached this problem mainly in terms of whether retroactive legal effect should be accorded per se to the 1964 reformation. In our view, it is unnecessary for us to traverse the difficult *73 path which would require us to delve into the application of the doctrine of "relation back" of transactions to which the taxing authority is not a party. [3] Compare Emerson Institute v. United States, 356 F. 2d 824 (C.A.D.C. 1966), Piel v. Commissioner, 340 F. 2d 887 (C.A. 2, 1965), affirming a Memorandum Opinion of this Court, M. T. Straight's Trust v. Commissioner, 245 F. 2d 327 (C.A. 8, 1957), affirming 24 T.C. 69 (1955), and Sinopoulo v. Jones, 154 F. 2d 648 (C.A. 10, 1946), with Flitcroft v. Commissioner, 328 F. 2d 449 (C.A. 9, 1964), reversing 39 T.C. 52 (1962). We think that the problem can and should be disposed of on another basis, namely, an examination of the extent to which petitioner made a completed transfer in 1960 to the Sisters of St. Francis. In this context, the 1964 reformation has only evidentiary and not substantive legal effect. Petitioner asserts *74 that he intended to give only a one-fifth undivided interest in 1960, 1174 although the deed purported to pass legal title to all his interest in the property, and that he made a unilateral mistake as to the legal effect of the deed. On this basis, petitioner argues that under Minnesota law, at the time of the initial transfer in 1960, he had a right of defeasance against the Sisters of St. Francis for the excess of the transfer over his one-fifth undivided interest and that this right preserved his interest in the other four-fifths for the purpose of later disposition. Respondent disagrees. We must look to the law of Minnesota, where the real property was located, for the answer to the problem thus posed. Our determination in this regard should, according to the mandate of the Supreme Court of the United States in Commissioner v. Estate of Bosch, 387 U.S. 456 (1967), be predicated - on state law and the State's highest court is the best authority on its own law. If there be no decision by that court then federal authorities must apply what they find to be the state law *75 after giving "proper regard" to relevant rulings of other courts of the State. In this respect, it may be said to be, in effect, sitting as a state court. [Citation omitted. See 387 U.S. at p. 465.] We see no need to dwell upon the intricacies of the law of reformation or rescission based upon mistake. Most of the difficulties in this area stem from the fact that the rights of innocent third parties who have furnished consideration would be affected. Such is not the situation herein, where only a gratuitous donee is involved and, for this reason, the Minnesota authorities cited by respondent are not germane. Nor do we think that the Federal tax authority can claim absolute protection as an innocent third party, since it neither had nor could assert any interest in the property itself or in the arrangement per se. We have found no cases wherein the state courts have sustained such a claim in the determination of the property rights of private litigants. Indeed, Commissioner v. Estate of Bosch, supra, teaches that the Federal tax authority is not entitled to absolute *76 proteltion; it can and should, however, be assured that the rights of private parties are determined in accordance with the actual or judicially imputed views of the highest court of the state, as ascertained by the Federal courts. Where only the rights of a gratuitous donee are involved, the law seems clear that the donor is entitled to restructure the transfer because of unilateral mistake. Gray v. Gray, 344 S.W. 2d 329 (Ark. 1961); Twyford v. Huffaker, 324 S.W. 2d 403 (Ky. App. 1959); Jonas v. Meyers, 410 Ill. 213, 101 N.E. 2d 509 (1951); Tyler v. Larson, 106 Cal. App. 2d 317, 235 P. 2d 39 (1951). See 69 A.L.R. 423, 434; 128 A.L.R. 1299, 1302; 4 Tiffany, The Law of Real Property 86 (1939 ed.). Accord, Restatement, Restitution, sec. 49 (1937). In large part, our findings of fact are based upon the testimony of petitioner, who was a forthright and convincing witness. We see no need to repeat the numerous elements, set forth in detail in our findings, which lead us to the conclusion that petitioner and his *77 wife labored under a unilateral mistake at the time of the original transfer in 1960. We think that the evidence which support these findings meets the "clear and convincing" standard applied by the Minnesota courts in cases involving the availability of reformation as against third parties who furnished consideration. Gethsemane Lutheran Church v. Zacho, 258 Minn. 438, 104 N.W. 2d 645 (1960), Glaser v. Alexander, 247 Minn. 130, 76 N.W. 2d 682 (1956), Fritz v. Fritz, 94 Minn. 264, 102 N.W. 705 (1905). Whether or not the Minnesota courts would apply a less strict standard of proof as against a gratuitous donee, we need not now decide. We are satisfied that, although we have found no Minnesota case which involved such a donee, the highest court of that state would, under the circumstances herein, follow the prevailing rule in other jurisdictions and hold that the original 1960 transfer passed only bare legal title to petitioner's entire interest in the property and that, immediately after such transfer, petitioner had the unqualified right, as against the Sisters of St. Francis, to defeat that transfer to the extent of four-fifths thereof. *78 Commissioner v. Estate of Bosch, supra.Cf. Hatcher v. Union Trust Co., 174 Minn. 241, 219 N.W. 76 (1928). Thus, in 1960, the Sisters of St. Francis were given complete ownership of one-fifth of petitioner's interest in the property and bare legal title to the other four-fifths. Petitioner had the unqualified right, after the 1960 transfer, to revest in himself title to that four-fifths interest. He could take it back at will. The fact that his power was dehors the instrument, rather than expressed in the instrument itself, is immaterial. Helvering v. Helmholz, 296 U.S. 93 (1935); Burnet v. Guggenheim, 288 U.S. 280 (1933); Estate of Mary Lois K. McIntosh, 25 T.C. 794 (1956), at pp. 803-804. To be sure, 1175 petitioner might need the assistance of a court to enforce that will, but it is clear to us that such assistance would be unconditionally forthcoming. Under these circumstances, four-fifths of petitioner's transfer in 1960 was illusory and therefore did not have the necessary degree of completeness to be recognized for Federal tax purposes. Burnet v. Guggenheim, supra; Commissioner v. Allen, 108 F. 2d 961 *79 (C.A. 3, 1939), reversing 38 B.T.A. 871 (1938). [4] The possible administrative difficulties with which respondent might be faced are not a significant inhibiting factor against this conclusion. See Commissioner v. Allen, supra, 108 F. 2d at p. 966. Moreover, our conclusion is reinforced by the basic approach of respondent in his regulations dealing with the incompleteness of transfers for income and gift tax purposes. Section 1.170-1(e), Income Tax Regs., and section 25.2511-2(c), Gift Tax Regs. Cf. Commissioner v. Sternberger's Estate, 348 U.S. 187 (1955). Having determined that the transfer in 1960 was incomplete as to four-fifths of petitioner's interest, we are left with the task of determining to what extent, if any, he made transfers of that retained interest in the taxable years before *80 us. We are satisfied, as our findings of fact show, that he transferred a one-fifth interest in 1961. With respect to 1962 and 1963, the situation is more dificult. Petitioner points out that his returns for each of these years claimed a deduction for one-fifth of that interest, but clearly the returns are not proof of the fact of transfer. Nor are we persuaded by the assertion that we should draw an inference of transfer from the general testimony of one of petitioner's lawyers as to the course of the negotiations leading to the reformation. A deed of a one-fifth interest in 1961 was submitted in evidence. It would not have been difficult to present similar deeds in 1962 and 1963. But this was not done. Moreover, petitioner testified that he could not remember whether he had executed any deeds in those years. In light of the foregoing and in the absence of any other evidence in the record, we conclude that, in fact, petitioner made no transfers of any portion of his retained interest to the Sisters of St. Francis either in 1962 or 1963. [5]
*81 Decision will be entered under Rule 50. Footnotes
1. All references, unless otherwise stated, are to the Internal Revenue Code of 1954.↩
2. Petitioner had received an extension of time for filing until July 15, 1961.↩
3. A district court has granted relief to Nina Cullinan on this ground. See Dodge v. United States [68-2 USTC 9515], 292 F. Supp. 573↩ (S.D.Fla., July 26, 1968), on appeal (C.A. 5, Sept. 23, 1968).
4. This Court has since indicated its acceptance of the holding of the Court of Appeals. See Estate of Mary Lois K. McIntosh, 25 T.C. 794, 803 (1956), affd. 248 F. 2d 181 (C.A. 2, 1957); Adele F. Goodman, 4 T.C. 191, 194 (1944), affd. 156 F. 2d 218↩ (C.A. 2, 1946).
5. Petitioner's position apparently is not hopeless. Under our holding, he retained three-fifths of his interest in the property at the end of 1963. To the extent that he made completed charitable transfers in subsequent years, he would presumably be entitled to a deduction in those years and to carry over any excess amount for five subsequent years. See section 170(b)(5), enacted in Pub. L. 88-272 (1964).↩